UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FELIX DARRELL DIXON, JR.,

                Plaintiff,

v.                                                    Case No. 23-cv-85-pp

DR. ERIC LEE,

                Defendant.

**ORDER GRANTING DEFENDANT'S UNOPPOSED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 19) AND DISMISSING CASE**

Plaintiff Felix Darrell Dixon, Jr., who is incarcerated at Green Bay Correctional Institution and is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against Dr. Eric Lee, a doctor at the University of Wisconsin–Madison Hospital (UW Health). The defendant has moved for summary judgment. Dkt. No. 19. The plaintiff has not responded to the motion. The court will grant the defendant's unopposed motion and dismiss this case.

**I.    Facts**

    **A.**    <u>Procedural Background</u>

On January 23, 2023, the court received the plaintiff's complaint asserting claims against Dr. Lee and UW Health. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim against Dr. Lee but did not allow him to proceed against UW Health. Dkt. No. 8.

On August 18, 2023, after Dr. Lee had answered the complaint, the court issued a scheduling order instructing the parties to complete discovery by January 17, 2024 and to file dispositive motions by February 16, 2024. Dkt. No. 14. The court denied the plaintiff's motion to appoint counsel (Dkt. No. 15) because the plaintiff had not "demonstrated that he is one of those self-represented persons most in need of an attorney to litigate his case effectively." Dkt. No. 18. The court recounted that the plaintiff had engaged in discovery and opined that he appeared to know how to proceed in the case. Id. at 5. Neither party filed any other motions during the discovery phase.

At the February 16, 2024 deadline, the court received the defendant's motion for summary judgment. Dkt. No. 19. In a February 20, 2024 order, the court ordered that within thirty days—by March 18, 2024—the plaintiff must file his opposition to the motion. Dkt. No. 24. The court advised that

> [i]f the court has not received the plaintiff's written response in opposition to the defendant's summary judgment motion by March 18, 2024, the court has the authority to treat the defendant's motion as unopposed, accept all facts the defendant asserts as undisputed and decide the motion based only on the arguments in the defendant's brief, without any input from the plaintiff. That means the court likely will grant the defendant's motion and dismiss the case.

Id. at 2.

At the March 18, 2024 deadline, the court received the plaintiff's first motion asking the court to extend his deadline to respond to the summary judgment motion. Dkt. No. 25. The court granted the motion the next day and extended to April 19, 2024 the plaintiff's deadline for responding. Dkt. No. 26. In his motion, the plaintiff also asked, "[A]t what point can I refile for

appointment of counsel?" Id. In response to that question, the court reminded the plaintiff that if he wished to again request appointment of counsel, "he must be able to 'demonstrate that he is one of those self-represented persons most in need of an attorney to litigate his case effectively.'" Id. (quoting Dkt. No. 18 at 5).

On April 4, 2024, the court received the plaintiff's second motion to appoint counsel. Dkt. No. 27. The court denied that motion on April 25, 2024, finding that the plaintiff still had not satisfied the criteria for the court to appoint him counsel. Dkt. No. 28. The court explained that the plaintiff had provided "no new information demonstrating 'that he is one of those self-represented persons most in need of an attorney to litigate his case effectively,' as the court twice previously told him he must before the court will attempt to recruit him an attorney." Id. at 4. The court reiterated the detailed information it had sent the plaintiff explaining the procedures that he must follow for responding to the summary judgment motion. Id. The court advised the plaintiff for the second time that he could tell the court his version of the events in an affidavit or declaration, and the court pointed him to pages in the guide it previously had sent him that contained additional information about responding to the motion. Id. at 4–5 (citing Dkt. No. 24 at 1–2; Dkt. No. 8 at 11). The court gave the plaintiff "**a final extension of his deadline** to respond to the defendant's motion for summary judgment" and ordered him to file his response by May 31, 2024. Id. at 5 (emphasis in original). The court reiterated that if it did not "receive[] the plaintiff's response materials, or a written

explanation why he cannot provide a response, by that deadline, the court [would] consider the defendant's motion to be unopposed and [would] decide it without the plaintiff's input." Id.

On May 24, 2024, the court received the plaintiff's second motion for an extension of time to respond to the summary judgment motion. Dkt. No. 29. The plaintiff asserted that he needed additional time to "procure affidavits from the two officers that escorted [him] to UW Madison hosipital [sic] on the day in question" and to prepare a declaration. Id. at 1–2. The court responded in a text-only order dated May 28, 2024. Dkt. No. 30. The court recounted that it had told the plaintiff in its April 25, 2024 order denying his second motion to appoint counsel "that [May 31, 2024] would be the 'final extension of his deadline to respond to the defendant's motion for summary judgment.'" Dkt. No. 30 (citing Dkt. No. 28 at 5). The court explained that the parties' deadline for completing discovery had expired on January 17, 2024 and that the plaintiff never had asked for additional time to complete discovery. Id. The court observed that the plaintiff had offered "no reason why he was unable to obtain affidavits by that deadline," and that he had described "no circumstances warranting a further extension of time to respond to the defendant's motion for summary judgment." Id. Because the plaintiff had not shown good cause for a further extension of time, the court denied his request for one. Id. The court ordered the plaintiff to file his response to the summary judgment motion by the end of the day on May 31, 2024. Id.

The May 31, 2024 deadline has passed, and the court has not received the plaintiff's opposition materials or an explanation why he was not able to file them by the deadline. All of the court's orders were sent to the plaintiff at Green Bay and none were returned to the court as undeliverable. The Department of Corrections' offender locator shows that the plaintiff still is housed at Green Bay. The court has no reason to believe he did not receive the court's orders.

On June 24, 2024, defense counsel filed a letter observing that the plaintiff did not file a response and asking the court to grant the defendant's motion and dismiss this case with prejudice. Dkt. No. 31. The court will not dismiss this case as a sanction for the plaintiff's noncompliance. Instead, the court will enforce its previous order and consider the defendant's motion to be unopposed. That means the court will consider the defendant's proposed facts to be undisputed and consider the assertions in the defendant's brief to be unopposed for purposes of this decision.

B.     Factual Background

1.     *The Complaint*

The complaint involves treatment that the plaintiff received from Dr. Lee at UW Health on May 11, 2022. Dkt. No. 1 at 2. The court summarized the allegations in the screening order:

> The complaint alleges that on May 11, 2022, two correctional officers (who are not defendants) escorted the plaintiff to the hospital for an appointment with Dr. Lee. The appointment was scheduled so Dr. Lee could remove a hard cast from the plaintiff's left hand and remove two surgical pins that were in his hand. During the appointment, a nurse removed the cast without incident, but Dr. Lee

5

The May 31, 2024 deadline has passed, and the court has not received the plaintiff's opposition materials or an explanation why he was not able to file them by the deadline. All of the court's orders were sent to the plaintiff at Green Bay and none were returned to the court as undeliverable. The Department of Corrections' offender locator shows that the plaintiff still is housed at Green Bay. The court has no reason to believe he did not receive the court's orders.

On June 24, 2024, defense counsel filed a letter observing that the plaintiff did not file a response and asking the court to grant the defendant's motion and dismiss this case with prejudice. Dkt. No. 31. The court will not dismiss this case as a sanction for the plaintiff's noncompliance. Instead, the court will enforce its previous order and consider the defendant's motion to be unopposed. That means the court will consider the defendant's proposed facts to be undisputed and consider the assertions in the defendant's brief to be unopposed for purposes of this decision.

B.     Factual Background

1.     *The Complaint*

The complaint involves treatment that the plaintiff received from Dr. Lee at UW Health on May 11, 2022. Dkt. No. 1 at 2. The court summarized the allegations in the screening order:

> The complaint alleges that on May 11, 2022, two correctional officers (who are not defendants) escorted the plaintiff to the hospital for an appointment with Dr. Lee. The appointment was scheduled so Dr. Lee could remove a hard cast from the plaintiff's left hand and remove two surgical pins that were in his hand. During the appointment, a nurse removed the cast without incident, but Dr. Lee

5

noticed that one of the surgical pins was protruding from the plaintiff's hand. He removed the pin and then attempted to locate the second one, but he was unable to find it. A nurse brought a portable x-ray machine to find the second pin, which Dr. Lee discovered was "lodged in the bone" in the plaintiff's wrist or hand. The plaintiff asked Dr. Lee if he would have to schedule a second surgery to remove the pin, but Dr. Lee told the plaintiff that "he believed he could retrieve it and was gonna try."

The complaint alleges that Dr. Lee used a scalpel to make an incision in the plaintiff's left thumb "and began digging in [his] hand with surgical scissors." The plaintiff says that "this was extremely painful despite the numbing agent Dr. Lee applied to lessen the pain." After Dr. Lee spent thirty minutes "digging in [the plaintiff's] hand blind," the plaintiff says that "it started to feel like something was ripping in [his] hand." He told Dr. Lee, who assured the plaintiff "he was almost done." A nurse entered the room and asked Dr. Lee if everything was okay while "noticeably cringing." Dr. Lee "quickly dismissed her and continued to dig in [the plaintiff's] hand." The plaintiff alleges that both officers who escorted him to the appointment also were cringing and had to look away several times. The plaintiff asked Dr. Lee "could we just call it quits" because of the "excruciating pain," but Dr. Lee assured him "that he almost had it, and that he knew he could get it."

The plaintiff alleges that after an hour, he "began to beg Dr. Lee to stop" because he "absolutely could take no more." He says that "the pain in [his] hand was unbearable and the ripping sensation was like nothing [he] ever felt before, this was pain on another level entirely." Dr. Lee agreed to stop and had the nurse apply a new cast to the plaintiff's hand. The plaintiff says his hand had become swollen, and his "fingers were tight with blood." On May 13, 2022, the plaintiff was taken on an emergency trip to Belin Health in Green Bay to have the cast removed and replaced "because of the pain and swelling as a result of what Dr. Lee did to [his] hand."

Dkt. No. 8 at 3–5 (internal citations omitted).

The court found that the complaint's allegations stated a viable Eighth Amendment claim against Dr. Lee. Id. at 6. The court observed that the complaint did not make clear whether Dr. Lee was acting as a state employee when he treated the plaintiff, and "[a] suit under §1983 may be brought only

against government officials or employees or individuals who acted 'under color of state law.'" Id. at 6–7 (citing Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 822 (7th Cir. 2009)). The court explained that the plaintiff could not "'be charged fairly with knowing' whether Dr. Lee was a hospital employee or whether he rendered treatment pursuant to a contract between the hospital and the prison, which could make him a state actor." Id. at 7–8 (quoting Rodriguez, 577 F.3d at 830). The court assumed for the purpose of screening that Dr. Lee was a state actor and allowed the plaintiff to proceed on his Eight Amendment claim. Id. at 8. The court stated that Dr. Lee could move to dismiss the case if he could present "evidence showing [he] is a hospital employee and was not a state actor when he treated the plaintiff." Id. The court dismissed the hospital itself as a defendant because it "is not a 'person' that may be sued under §1983. Id.

2.   *The Defendant's Undisputed Facts*

Dr. Lee is a licensed medical doctor in Wisconsin and currently a fifth-year resident in the Department of Orthopedic Surgery at UW Health. Dkt. No. 22 at ¶8. At the time of the events alleged in the complaint, he was a third-year surgery resident. Id. He was and is an employee of the University of Wisconsin Hospitals and Clinics Authority (UWHCA). Id. at ¶9. He is not an employee of the Wisconsin Department of Corrections (DOC) or Green Bay Correctional Institution, and he never has had a contract with the DOC or any correctional institution. Id. at ¶¶13–14. Dr. Lee also never has seen or treated patients inside a correctional facility. Dkt. No. 20 at ¶4. He says that incarcerated

persons are seen about once a month on dedicated days at the hospital in the "secure" clinic. Id. at ¶5.

    a. The Plaintiff's Injury

On January 12, 2022, the plaintiff had an offsite appointment at UW Health and saw Dr. Bradley Foulke (not a defendant), supervised by Dr. Stefan Zachary (also not a defendant), for complaints of left thumb pain and limited range of motion after he fell off his top bunk a few months earlier. Dkt. No. 22 at ¶18. Dr. Foulke diagnosed the plaintiff with a dislocated thumb and recommended surgical and non-surgical options. Id. at ¶19. The plaintiff elected "joint pinning surgery," which carried several risks including a need for further surgery, which Dr. Foulke explained to the plaintiff. Id. at ¶20.

On March 18, 2022, the plaintiff underwent surgery with Dr. Zachary, who again explained the risks of the procedure. Id. at ¶21. Dr. Zachary performed a closed reduction and pinning of the plaintiff's left thumb, which was successful and without complication. Id. at ¶22. Dr. Zachary noted that the plaintiff would need to keep the pins in his thumb for at least two months, after which they could be removed under local anesthetic. Id. at ¶23.

On March 30, 2022, the plaintiff returned to the UW Health clinic for follow-up care and saw Dr. Abbey DeBruin (not a defendant). Id. at ¶24. Dr. DeBruin noted that the plaintiff was "recovering as expected" and would be transitioned into a thumb cast that would remain for four-to-six weeks. Id. at ¶25; Dkt. No. 20-1 at 72. She wrote that the plaintiff would return to the clinic for cast removal, x-rays and pin removal under local anesthetic. Dkt. No. 22 at

¶26. She discussed the "expectations for pin removal procedure," and the plaintiff agreed with the course of action. Id.

### b. The May 11, 2022 Appointment

The plaintiff was scheduled to return to UW Health six weeks later, and he saw Dr. Lee on May 11, 2022 in the "hand inmate clinic." Id. at ¶27. During his assessment, Dr. Lee removed the plaintiff's cast and found a 0.5 mm by 0.5 mm opening over part of the plaintiff's thumb where one of the surgical pins was "eroding through this opening." Id. at ¶29. He saw some reddening and pus around the opening, which suggested an infection at the pin site. Id. at ¶30. Dr. Lee had the plaintiff undergo x-rays, which showed that his thumb was healing appropriately, the pins were intact and the plaintiff's joint was "well-reduced." Id. at ¶32. Because the plaintiff's thumb was healing properly, he decided to remove the two surgical pins in the plaintiff's hand as previously planned. Id. at ¶33. The plaintiff agreed with that plan. Id.

Dr. Lee avers that surgical pins are "commonly" removed in outpatient clinics under only local anesthesia. Dkt. No. 20 at ¶12. He says doing so "avoids the need for general anesthesia and larger surgery." Id. He avers that this method is "safe and effective," and he was taught that it "is within the standard of care." Id. Dr. Lee says that surgical pins in the thumb should not be left in "too long" or "the thumb can lose range of motion and become very stiff." Id. at ¶21. He also wanted to remove both pins from the plaintiff's thumb because there was evidence of an infection around the area of the first pin. Id. Dr. Lee was concerned that the infection could spread or that the second pin

9
Case 2:23-cv-00085-PP   Filed 07/03/24   Page 9 of 19   Document 32

was already contaminated. Id. He also knew that incarcerated persons were seen in the clinic on only "certain 'secure days,'" so he did not want the plaintiff to have to return "at an unknown time in the future or have to undergo a second surgery under anesthesia to remove the pins." Id.

Dr. Lee injected the plaintiff's hand with lidocaine with epinephrine to numb the area where he would be working. Dkt. No. 22 at ¶38. He avers that the lidocaine should have lasted for at least six to eight hours. Dkt. No. 20 at ¶18. Dr. Lee ensured that the plaintiff's hand was numb before proceeding. Dkt. No. 22 at ¶39. He removed the first pin, which was poking through the plaintiff's skin and creating the small opening he had observed. Id. at ¶40. Dr. Lee avers that this pin was loose and easily removed. Id. He then attempted to locate the second pin, which was not clearly visible. Id. at ¶41. He used a tool called a needle driver to attempt to locate the second pin through the half-millimeter opening from the first pin, but he could not find the pin even after "slightly extending" the opening in the plaintiff's thumb. Id.

Because he could not find the second pin, Dr. Lee moved the plaintiff to another room to perform an x-ray with fluoroscopy, which shows movements and is not static. Id. at ¶43. He explains that this would allow him to locate the second pin without making a larger incision in the plaintiff's hand. Id. Dr. Lee's medical notes say that he made a "small incision" over part of the plaintiff's thumb, and "soft tissues were spread down to metacarpal bone." Dkt. No. 20-1 at 60. Dr. Lee was able to find the second pin, but it "was deeply embedded in the bone." Dkt. No. 22 at ¶44. He attempted to remove the pin using the needle

driver, but he was unable to grasp the head of the pin hard enough to remove it despite multiple attempts. Id. at ¶45. Dr. Lee advised the plaintiff that he could either keep trying to remove the second pin or leave it in and schedule a follow-up appointment for removal of the pin. Id. at ¶46. The plaintiff elected to leave the pin in his thumb, so Dr. Lee stopped attempting to remove it and placed one small suture over the opening he created when attempting to find the second pin. Id.

Dr. Lee ordered the plaintiff's thumb to be re-casted, which other medical staff completed. Id. at ¶47. He also ordered the plaintiff to take an antibiotic for ten days to treat the pin-site infection and prescribed him oxycodone for pain. Id. at ¶48. Dr. Lee advised the plaintiff to return in four weeks to remove the cast, perform x-rays and again attempt to remove the second pin. Id. at ¶49. He noted that there was "no rush" to remove the pin, which he avers meant "that the pin did not need to be emergently removed, but that it still needed to come out very soon." Dkt. No. 20 at ¶22. He notes that if the pin "migrated or loosened," staff could remove it in the clinic; otherwise, the plaintiff would likely require a second surgery under general anesthesia to remove the pin. Id.

Dr. Lee avers that he believes he provided care and treatment "within the standard of care for a reasonable orthopedic surgeon and orthopedic surgery resident." Id. at ¶27. He says he does not recall the plaintiff "ever screaming, crying, flinching, or making any gestures or movements that suggested to [Dr. Lee that the plaintiff] was in pain during [Dr. Lee's] attempts to remove the second pin." Id. at ¶19. He says that based on his experience treating patients

11

Case 2:23-cv-00085-PP   Filed 07/03/24   Page 11 of 19   Document 32

and performing similar pin removals, he "did not perceive [the plaintiff] to be in any significant pain during [Dr. Lee's] attempts at the removal of the second pin." Id. Dr. Lee avers that he "felt that [the plaintiff] handled [the] attempt at removing the pin very well and that he was generally calm and relaxed throughout the procedure." Id. Dr. Lee does not recall the plaintiff asking him to stop attempting to remove the second pin or requesting more pain medication. Id. at ¶20. He says that he would have provided more pain medication if the plaintiff had requested it. Id. He avers that he did not cause the plaintiff unnecessary pain. Id. at ¶27.

### c. Later Care and Treatment

The next day, May 12, 2022, the plaintiff complained to medical staff at Green Bay that his cast felt "too tight" and was hurting him. Dkt. No. 22 at ¶55. Green Bay contacted UW Health, and a physician's assistant referred the plaintiff to a local facility for a new cast. Id. at ¶¶56–57. The plaintiff was satisfied with the new cast, and the Green Bay nurse who treated him reported that he was not in "much pain," and his hand appeared "less swollen." Id. at ¶58. The plaintiff removed his cast on June 9, 2022, because "it got wet and he didn't want to get an infection." Id. at ¶59; Dkt. No. 21-1 at 10. He returned to UW Health on June 22, 2022, and saw resident physician Dr. Kylie Edinger (not a defendant) under the supervision of Dr. Zachary. Dkt. No. 22 at ¶60. The plaintiff reported that he had not worn support for his thumb since removing his cast, and that he felt soreness and tingling on both sides of his thumb where Dr. Lee removed the first pin. Id. at ¶62. X-rays showed his injured

thumb was healing properly, but the second pin had not migrated or moved. Id. at ¶63. The clinic scheduled the plaintiff for surgery to remove the second pin. Id. at ¶64. Dr. Edinger noted that she was "not sure what caused" the numbness and tingling the plaintiff complained of but "believe[d] this is unlikely related to his pin removal procedure 6 weeks ago when the numbness started." Id. at ¶65. A month later, the plaintiff underwent surgery under general anesthesia to remove the second pin. Dkt. No. 20-1 at 5; Dkt. No. 21-1 at 7.

On August 17, 2022, the plaintiff again returned to UW Health for a follow-up from his pin removal surgery. Dkt. No. 22 at ¶67. The notes from this visit say he was "progressing as expected post-operatively," and the "numbness in his thumb should continue to resolve over time." Id. at ¶68.

**II. Discussion**

    A.    <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See <u>Anderson</u>, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u>

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.   Analysis

Dr. Lee avers that he is entitled to judgment as a matter of law because he was not acting under color of state law when he treated the plaintiff.[1] Dkt. No. 23 at 8. He says he was not a DOC employee and did not have a contract with the DOC or any correctional facility to provide treatment to incarcerated persons. Id. at 10. He was a resident physician employed by UWHCA, and "employees of UWHCA are not state employees." Id. (citing Wis. Stat. §233.17 and Suchomel v. Univ. of Wis. Hosp. & Clinics, 708 N.W.2d 13, 20 (Wis. Ct. App. 2005)) (emphasis in original). Dr. Lee contends that his status as a non-state actor does not change "simply because [he] provided treatment to" the plaintiff. Id. Dr. Lee asserts that he did not regularly treat incarcerated persons, did not provide care in a correctional facility and treats "any patient who is scheduled to see him, including the occasional inmate that is scheduled during 'secure clinic.'" Id. He emphasizes that he saw the plaintiff only once and did not have "an ongoing treatment relationship with" him. Id. at 10–11.

---

[1] Dr. Lee raised this affirmative defense in his answer to the complaint. Dkt. No. 13 at 3, ¶2.

Whether a medical provider is acting as a state actor or employee depends on "the relationship between the state, the medical provider, and the prisoner." Shields v. Ill. Dep't of Corr., 746 F.3d 782, 797 (7th Cir. 2014) (citing Rodriguez, 577 F.3d at 826). The Seventh Circuit has distinguished between a business that "contracts to provide medical care to prisoners" and "medical providers who have 'only an incidental or transitory relationship' with the penal system." Id. at 797–98 (quoting Rodriguez, 577 F.3d at 827). In Shields, the Seventh Circuit held that two doctors who performed "a one-time examination" on an incarcerated person on referral from Wexford—a private company that contracted with the Illinois Department of Corrections to provide medical care to incarcerated persons—"had only an incidental and transitory relationship with the penal system." 746 F.3d at 798. The doctors did not schedule a follow-up appointment with the incarcerated person or "retain[] responsibility for his course of treatment." Id. Nor did the doctors have a close relationship or a contract with Wexford or regularly treat incarcerated persons as part of their practice. Id. The Seventh Circuit explained that "merely having treated inmates before does not establish the kind of close relationship between the doctors and Wexford required to find that they were state actors." Id. The Seventh Circuit concluded that the doctors were not acting under color of state law when they treated the plaintiff and affirmed the district court's grant of summary judgment for the doctors. Id.

The conclusion from Shields applies here. There is no evidence that Dr. Lee contracted with the DOC or Green Bay to provide care for the plaintiff

or to incarcerated persons generally. Dr. Lee avers that seeing incarcerated persons is not a regular part of his practice, and he has never treated patients in a correctional setting. The evidence shows that he only occasionally treated incarcerated persons in the "secure clinic" at the hospital about once a month. This infrequent treatment for incarcerated persons "does not establish the kind of close relationship between" Dr. Lee and the DOC that would allow the court to conclude that Dr. Lee was a state actor. Shields, 746 F.3d at 798. It is undisputed that Dr. Lee saw the plaintiff only once in May 2022. He did not perform the plaintiff's initial assessment in January 2022 or his March 2022 surgery. Although Dr. Lee informed the plaintiff that he would have to return to the clinic for a follow-up appointment to remove the second pin, he did not schedule that appointment. Nor did he see the plaintiff for that follow-up appointment, perform the second surgery in July 2022 or assess the plaintiff's post-operative progress at his August 2022 appointment. In other words, there is no evidence that Dr. Lee "retained responsibility for [the plaintiff's] course of treatment." Id. at 798. His treatment relationship with the plaintiff and the DOC was instead "incidental or transitory." Id. at 797–98.

Nor is there evidence suggesting that, despite Dr. Lee's limited involvement with the plaintiff's treatment, he is or was a state employee. The undisputed evidence instead shows that in May 2022, when he treated the plaintiff, Dr. Lee was working at the University of Wisconsin–Madison Hospital as an employee of UWHCA. Dkt. No. 22 at ¶9; Dkt. No. 20-2 (Employment Contract with UWHCA). In Kreger-Mueller v. Shiner, Case No. 18-CV-708, 2020

16
Case 2:23-cv-00085-PP   Filed 07/03/24   Page 16 of 19   Document 32

WL 429448, at *2 (W.D. Wis. Jan. 28, 2020), which the court cited in the screening order, another court in this district explained that the State of Wisconsin stopped assuming liability for the hospital in the 1990s after the state legislature created the UWHCA. The state retains liability only for university faculty, staff and students. Id. (citing Wis. Stat. §233.17). As the court explained, "whether health care providers at UW Hospital are state employees depends on whether they are faculty, staff, or students of the university (in which case they are state employees) or employees of the University of Wisconsin Hospital and Clinics Authority [UWHCA] (in which case they are not)." Id. (citing Wis. Stat. §233.17 and Suchomel, 708 N.W.2d at 20). No evidence suggests that Dr. Lee was employed as faculty or staff of the University of Wisconsin, and he was not a student at the University. (Dr. Lee completed medical school at the University of Iowa. Dkt. No. 20 at ¶2.) As an employee of the UWHCA, Dr. Lee was not a state employee or a state actor, and the state is not liable for his alleged mistreatment performed at the hospital.

Dr. Lee was not acting under color of state law when he treated the plaintiff on May 11, 2022. He cannot be sued under §1983, which applies only to state actors. The court will dismiss this lawsuit because Dr. Lee is not a viable defendant, and there are no claims or defendants remaining. This decision does not prevent the plaintiff from bringing a claim against Dr. Lee in state court under state law.[2]

---

[2] Because the court finds that Dr. Lee was not a state actor who may be sued under §1983, it will not address his alternate argument that he was not deliberately indifferent to the plaintiff's medical need. Dkt. No. 23 at 11–20.

### III. Conclusion

The court **GRANTS** the defendant's unopposed motion for summary judgment. Dkt. No. 19.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. Pro. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court*. See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under

Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 3rd day of July, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**